

**SO ORDERED.**
**SIGNED this 20th day of April, 2026**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

**Nicholas W. Whittenburg**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | **Case No. 1:25-bk-11197-NWW** |
| **POOLE FUNERAL HOME** | ) | |
| **REAL ESTATE, LLC,** *et al.*, | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | **Jointly Administered** |
| | ) | |

---

**ORDER (I) AUTHORIZING THE SALE OF**
**SUBSTANTIALLY ALL GEORGIA ASSETS AND (II) GRANTING RELATED RELIEF**

---

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (a) authorizing, but not directing, the Debtors to sell the Georgia Assets (as defined in the Motion) and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted as set forth herein.

2.    Pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, the Debtors are authorized, but not directed, in their reasonable business judgment, to sell the Georgia Assets pursuant to the terms of the transaction laid out in the Motion and as articulated herein.

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

3.      The Debtors have demonstrated sufficient basis to enter into the sale transaction and sell the Georgia Assets for the proposed purchase prices, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors, their estates, and other parties in interest.  The Asset sale is fair and reasonable, and the proposed purchase price constitutes reasonably equivalent value, fair consideration, and fair value for the Georgia Assets under the Bankruptcy Code and other similar laws.

4.      Attached hereto as **Exhibit A** is a fair and accurate unredacted version of the agreed Asset Purchase Agreement regarding the Georgia Assets.

5.      The sale transaction was negotiated, proposed, and entered into by the Debtors and the buyers without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the buyers have engaged in any conduct that would cause or permit the transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

6.      The sale is undertaken by the buyers in good faith, as that term is articulated in section 363(m) of the Bankruptcy Code, and as such, the reversal or modification of the authorization provided herein to facilitate the sale shall not affect the validity of the transaction unless that transaction is stayed.  The buyers are buyers in good faith of the Georgia Assets and are entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

7.      The sale prices for the Assets in Georgia are the highest and best prices offered for the Georgia Assets after a fulsome sale process undergone by The Foresight Companies.

8.      Considering the same, and pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Georgia Assets shall be transferred to the buyers free and clear of any and all liens, claims and interests of any kind or nature whatsoever, including any such rights or claims based on any putative successor or transferee liability.

9. This transfer of Georgia Assets to the buyers is representative of a legal, valid, and effective transfer of the Georgia Assets. On the date of closing, the Georgia Assets transfer shall vest the buyers with all of the Debtors' rights, title, and interests in the Georgia Assets free and clear of all liens, claims, and interests of any kind or nature whatsoever.

10. None of the buyers or their associated parties or affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and none of the buyers shall assume or in any way be held liable for any obligations of the Debtors. The transfer of the Georgia Assets to the buyers shall not subject the buyers to any liability regarding the Debtors or the operation of the Debtors' businesses on any theory of liability. This is inclusive of any fraudulent transfer-related liability or otherwise any other theory of liability.

11. Upon closing of the sale, the proceeds, including reasonable costs, shall be distributed by the closing agent for purposes of the sale as follows:

a. The closing agent shall distribute the sum of $49,950.00 to the Debtors' counsel's IOLTA account for payment of U.S. Trustee Fees; and

b. The closing agent shall distribute the sum of $96,949.81 to The Huntington National Bank for full payment of all outstanding liens and balances owed to Huntington National Bank for the payoffs of vehicle liens and/or lease balances.

c. The closing agent is authorized to transfer to the Debtors' counsel's IOLTA account an amount of $272,951.00, representing the potential commission of the sales professionals, The Foresight Companies. Such funds shall be held until an appropriate fee application is filed with and approved by the Court.

d. The closing agent is also authorized to distribute the remaining proceeds from the sale to the senior secured lender, Bancorp.

12.     Considering Mr. Brian Poole is the sole signatory for the Debtors, Mr. Poole, as managing member, is authorized to execute all necessary documents to effectuate the sale set forth in this Order.  No other signature of any other person is required for the Debtor to pass fee simple absolute title to the purchasers in accordance with the terms of this Order.

13.     This Motion and the notice of the same satisfies the requirements of Rule 6004(a) of the Bankruptcy Rules.  Moreover, the terms of this Order shall be deemed effective and enforceable immediately upon entry.

14.     Pursuant to Fed. R. Bankr. P. 7062 and 9014, the terms and conditions of this Order shall be effective immediately and shall not be subject to the stay provisions contained in Fed. R. Bankr. P. 6004(h) and 6006(d).  Time is of the essence with regards to this sale.

15.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

16.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of any applicable Bankruptcy Rules and the Local Rules are satisfied by such notice.

17.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

*###*

Approved for entry:

**RMR Legal PLLC**

By: */s/ Roy Michael Roman*
      Roy Michael Roman (TN BPR #042658)
**RMR Legal PLLC**
70 N. Ocoee Street
Cleveland, TN 37311
Telephone:    (423) 528-8484
Facsimile:    (423) 717-5564
E-mail:    roymichael@rmrlegal.com

*Counsel to the Debtors and Debtors-in-Possession*

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

By:    */s/ Justin Sveadas (by permission)*
    Justin Sveadas (TN BPR #022305)
    633 Chestnut Street, Suite 1900
    Chattanooga, TN 37405-1800
    (423) 209-4184 (phone)
    (423) 752-9589 (fax)
    jsveadas@bakerdonelson.com (e-mail)

*Attorney for The Bancorp Bank, National Association*

WOMBLE BOND DICKINSON (US) LLP

By:    */s/ Morgan L. Burkett (by permission)*
    Morgan L. Burkett (TN BPR #039436)
    1222 Demonbreun Street, Suite 1201
    Nashville, Tennessee 37203
    Phone:  (629) 312-1819
    Fax:  (202) 261-0044
    Morgan.burkett@wbd-us.com

*Attorney for The Huntington National Bank*

CONSENTED TO BY:

OFFICE OF THE UNITED STATES TRUSTEE

By:    */s/ David Holesinger (by permission)*
       David Holesinger (TN BPR #030189)
       Historic U. S. Courthouse
       31 East 11th Street, 4th Floor
       Chattanooga, TN 37402
       (423) 752-5156 (phone)
       david.holesinger@usdoj.gov (email)

*Attorney for the U.S. Trustee*

## Exhibit A

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**dated as of**

**[_____], 2026**

**by and among**

**SCI GEORGIA FUNERAL SERVICES, LLC**

**and**

**LAURENBROOK MANAGEMENT, INC.**

**and**

**POOLE FUNERAL HOME ENTERPRISES, INC.**

**and**

**PFH HOLDINGS, INC.**

**and**

**BRIAN POOLE**

886705v17

TABLE OF SCHEDULES

**SCHEDULES**

| | |
|---|---|
| Schedule 1.1 | Permitted Liens |
| Schedule 2.1(b) | Motor Vehicles |
| Schedule 2.2 | Retained Assets |
| Schedule 3.4(d) | No Breach; Consents |
| Schedule 3.5(a) | List of Personal Property |
| Schedule 3.5(c) | Personal Property Exceptions |
| Schedule 3.6 | List of Real Property |
| Schedule 3.8 | Contracts |
| Schedule 3.9(c) | Preneed Agreements Funded by Insurance |
| Schedule 3.10(a) | Permits; Compliance with Laws |
| Schedule 3.10(c) | Unclaimed Cremated Remains |
| Schedule 3.14 | Financial Statements |
| Schedule 3.16 | Employees and Employee Plans |
| Schedule 3.17(a) | Intellectual Property Rights |
| Schedule 3.18 | Insurance |
| Schedule 3.20 | Inventories |
| Schedule 3.21 | At-Need Accounts Receivable |
| Schedule 3.25 | Certain Service Information |

**EXHIBIT**

| | |
|---|---|
| Exhibit A | Purchase Price Allocation |

886705v17

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into as of [_____], 2026 (the "**Closing Date**"), by and among SCI Georgia Funeral Services, LLC, a Delaware limited liability company ("**Buyer**"), and Laurenbrook Management, Inc., a Georgia corporation ("**Laurenbrook**"), Poole Funeral Home Enterprises, Inc., a Georgia corporation ("**Poole FH**") and PFH Holdings, Inc., a Georgia corporation ("**PFH Holdings**," and together with Laurenbrook and Poole FH, the "**Company**"), and Brian Poole (the "**Principal**," and together with the Company, each a "**Seller Party**" and collectively, the "**Seller Parties**").

## RECITALS:

A.      Laurenbrook is engaged in the business of owning and operating the following funeral home businesses: Poole Funeral Home & Cremation Services, located at 1970 Eagle Drive, Woodstock, Georgia 30189 and Cremation Services of Georgia located at 1970 Eagle Drive, Woodstock, Georgia 30189; and Poole FH is engaged in the business of owning and operating the following funeral home and crematory business: Thomas L. Scroggs Funeral Directors, located at 6362 S Lee Street, Morrow, Georgia 30260 (together, the "**Business**").

B.      PFH Holdings owns all of the Real Property (as defined below) used in connection with the Business.

C.      The Principal owns all of the issued and outstanding stock of each of Laurenbrook, Poole FH and PFH Holdings.

D.      The parties hereto desire to enter into this Agreement pursuant to which (i) Buyer will purchase from Laurenbrook and Poole FH, and Laurenbrook and Poole FH will sell, transfer and convey ("**Transfer**") to Buyer substantially all of the assets and operations of the Business, free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f) (other than the Permitted Liens) and (ii) Buyer will purchase from PFH Holdings, and PFH Holdings will Transfer to Buyer the Real Property, free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f) (other than the Permitted Liens), as set forth herein.

E.      The parties hereto intend to effectuate the transactions contemplated by this Agreement pursuant to Section 363 of the Bankruptcy Code.

F.      The execution and delivery of this Agreement and the Seller Parties' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order (as defined below).

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller Parties hereby agree as follows:

886705v17

SECTION 1
DEFINITIONS

1.1.    Definitions.  The following terms used in this Agreement shall have the following meanings:

"**AC Indemnity**" has the meaning set forth in Section 9.3.

"**ADA**" means the Americans with Disabilities Act, as amended.

"**Affiliate**" means with respect to any Person, any other Person who is directly or indirectly controlling, controlled by or under common control with such Person.  For the purposes of this definition, the term "control," when used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble.

"**Assets**" has the meaning set forth in Section 2.1.

"**Assumed Contracts**" means all Other Contracts and Preneed Agreements.

"**Assumed Liabilities**" has the meaning set forth in Section 2.3(a).

"**At-Need Accounts Receivable**" means accounts receivable related to a contract for funeral and/or cemetery merchandise and services that has been fully performed by the Business prior to the Closing Date.

"**Bankruptcy Case**" means the voluntary, jointly-administered bankruptcy cases commenced by certain Seller Parties under Chapter 11 of the Bankruptcy Code, pending before the Bankruptcy Court, which is captioned as *In re Poole Funeral Home Real Estate, LLC, et al.*, Case No. 1:25-bk-11197-NWW.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Tennessee (Chattanooga Division) or any other successor court exercising jurisdiction over this Bankruptcy Case.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Basket**" has the meaning set forth in Section 9.4(a).

"**Business**" has the meaning set forth in the Recitals.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer Indemnitees**" has the meaning set forth in Section 9.3.

"**Buyer's Set Off Right**" has the meaning set forth in Section 2.9(f).

886705v17

"**CERCLA**" means the Comprehensive Environmental Compensation and Liability Act of 1980 (42 U.S.C. § 9601, *et seq*.), as amended.

"**Church Lease**" means that certain lease agreement dated as of March 25, 2026, by and between Poole FH dba Thomas L. Scroggs Funeral Directors and Rock Springs Baptist Church for the use of certain chapel facilities located at 6362 South Lee Street, Morrow, Georgia.

"**Closing**" has the meaning set forth in Section 2.8.

"**Closing Date**" has the meaning set forth in the Preamble.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Data**" has the meaning set forth in Section 5.5(a).

"**Consent**" means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"**Debt**" means any obligations for borrowed money.

"**Designated Recipient**" means BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, c/o Justin Sveada, 633 Chestnut Street, Suite 1900, Chattanooga, TN 37405-1800; jsveadas@bakerdonelson.com.

"**Disclosure Schedules**" has the meaning set forth in Section 3.

"**Effective Time**" has the meaning set forth in Section 2.8.

"**Employee Plan**" means (i) any "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) all other fringe or employee benefit plans, programs, contracts, schemes, agreements or arrangements, and (iii) all compensation plans, programs, contracts, schemes, agreements or arrangements, written or otherwise, statutory or contractual, for the benefit of or relating to any current or former employee, officer or director of the Company or any Person that, together with the Company, would be considered a single employer within the meaning of Section 4001 of ERISA or Section 414 of the Code.

"**Environmental Permits**" means any and all Permits which are currently required under or are issued pursuant to any Environmental Requirements.

"**Environmental Requirements**" means all applicable Laws, Permits and similar items of any Governmental Authority relating to the protection of human health or the environment, including but not limited to:  (i) all requirements pertaining to reporting, licensing, permitting, investigation, removal, abatement and remediation of emissions, discharges, releases, or threatened releases of Hazardous Materials; (ii) all requirements pertaining to the protection of the

886705v17

health and safety of employees or the public; and (iii) all other limitations, restrictions, conditions, standards, prohibitions, obligations, schedules and timetables contained therein or in any notice or demand letter issued, entered, promulgated or approved thereunder.  The term "Environmental Requirements" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Exchange**" has the meaning set forth in Section 5.12.

"**Existing Permits**" means all Permits necessary for the operation of the Business, except any funeral director's licenses.

"**Final Service Date**" means (i) for a funeral contract without cremation, the later of the date of the funeral service or the interment or entombment service included in the funeral contract and (ii) for a funeral contract with cremation, the later of the date of cremation, the date of the funeral service or the date of interment or inurnment service included in the funeral contract.

"**Financial Statements**" has the meaning set forth in Section 3.14.

"**Fundamental Representations**" has the meaning set forth in Section 9.1.

"**Governmental Authority**" means any national, sovereign, federal, state, local or foreign government, or any political subdivision thereof or any court of competent jurisdiction, administrative agency or commission or other governmental entity or instrumentality or official exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government whether domestic or foreign.

"**Hazardous Materials**" means any materials or substances:  (i) the presence of which requires investigation or remediation under any Law; (ii) which is or has been identified as a potential hazardous waste, hazardous substance, pollutant or contaminant under any applicable Law; or (iii) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, reactive or otherwise hazardous and has been identified as regulated by any Governmental Authority.

"**Holdback Amount**" has the meaning set forth in Section 2.9.

886705v17

"**Information System**" means a discrete set of electronic information resources organized for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information, as well as any specialized system such as industrial/process controls systems, telephone switching and private branch exchange systems, and environmental control systems.

"**Intellectual Property Rights**" means all intellectual property rights including, without limitation, all social media accounts, website domain names, software, patents, copyrights, inventions, processes, formulae, confidential business information, trademarks, service marks, logos, promotions, trade secrets, know-how and other proprietary rights, whether registered or unregistered and applications therefor, owned or used by the Business, including, without limitation, the Trade Names used in connection with the Business.

"**Knowledge of Seller Parties**" means as to a particular matter, the knowledge, after reasonable inquiry, of (i) the Principal, (ii) John Goddard and (iii) Margie Scroggs.

"**Laurenbrook**" has the meaning set forth in the Preamble.

"**Laws**" means any present and future common law and any foreign, federal, state and local statutes, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents, including without limitation, the interpretation thereof by any Governmental Authority charged with the enforcement thereof, as may be amended from time to time.

"**Liens**" means all liens, mortgages, claims, charges, security interests, options, preemptive purchase rights, easements, restrictions or other encumbrances.

"**Loss**" means any losses, liabilities, Debts, assessments, claims, actions, suits, proceedings, charges, deficiencies, penalties, interest, costs, expenses and other damages (including, without limitation, legal fees and expenses, court costs, professional fees, removal costs, remediation costs, closure costs, fines, penalties and expenses of investigation and ongoing monitoring), and Liens or other obligations of any kind, character or description (whether or not absolute, contingent, matured, liquidated, unliquidated, accrued, unaccrued, known, unknown, direct, indirect, derivative or otherwise).

"**Material Adverse Effect**" means, with respect to the Business, any result, occurrence, condition, fact, change, event, effect or development that has, or would reasonably be expected to have, a material adverse effect on the Assets, liabilities, condition (financial or otherwise), results of operations or prospects of the Business, taken as a whole; *provided*, *however*, that none of the following shall be deemed to constitute or be taken into account in determining whether there has been, such a Material Adverse Effect: any change, occurrence, event or development (a) resulting from general economic, political, financial, banking, credit or securities market conditions, including any disruption thereof and any interest or exchange rate fluctuations, (b) attributable to conditions affecting companies in the primary industry or industries in which the Business operates, (c) resulting from any changes in accounting rules or applicable Laws or the interpretation thereof by any Governmental Authority, (d) resulting from natural disasters, acts of terrorism or war (whether or not declared), or epidemics or pandemics or (e) arising out of any action taken or omitted to be taken at the request or with the consent of the other party or parties hereto; *provided* that the exceptions set forth in clauses (a), (b), (c) and (d) shall only apply to the

886705v17

extent such change, occurrence, event or development does not have or cause a disproportionate effect or change on the Business, taken as a whole, relative to other comparable Persons in the same primary industry or industries in which the Business operates.

"**Merchandise and Services Trusts**" means all preneed or at-need merchandise and services trust accounts, bank accounts, and similar accounts relating to the Preneed Agreements, whether required by applicable Law or whether established voluntarily.

"**Merchandise Inventory**" means all caskets, urns, and other inventory and supplies owned by the Company or used or held for use in connection with the operation of the Business.

"**Motor Vehicles**" has the meaning set forth in Section 2.1(b).

"**Non-Assignable Assets**" has the meaning set forth in Section 2.1.

"**Non-Competition Agreement**" has the meaning set forth in Section 5.10.

"**Order**" means any judgment, order, writ, injunction, award, decision, stipulation, settlement, process, ruling, subpoena, verdict or decree entered by any Governmental Authority or arbitrator.

"**Ordinary Course**" means the ordinary course of business, consistent with past custom and practice (including with respect to quantity, quality and frequency) of the Company.

"**OSHA**" means the Occupational Safety and Health Act, as amended.

"**Other Contracts**" means the Church Lease and any contracts, leases, rental agreements, tenancies, licenses, engagements and commitments, oral or written, expressed or implied, other than the Preneed Agreements, entered into by or on behalf of the Company in connection with the Business, which are being assumed by Buyer pursuant to Section 2.3(a) and set forth in Schedule 3.8 attached hereto.

"**Permit**" means any license, franchise, permit, concession, approval or registration certificates from, of or with a Governmental Authority.

"**Permitted Liens**" means (i) Liens for current Taxes or other governmental charges not yet due or payable, (ii) Liens described in Section 5.6(c), and (iii) Liens set forth in Schedule 1.1.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including, without limitation, a Governmental Authority.

"**Personal Information**" means any information that identifies an individual (such as name, street address, e-mail address, date of birth, health information, and social security, driver's license, passport or other governmental identification number).

886705v17

"**Personal Property**" means all furniture, computers, printers, books, records, tools, supplies, equipment, furnishings and all other tangible personal property owned by any of the Seller Parties and used in the Business.

"**PFH Holdings**" has the meaning set forth in the Preamble.

"**Poole FH**" has the meaning set forth in the Preamble.

"**Preliminary Title Reports**" has the meaning set forth in Section 5.6(a).

"**Preneed Accounts Receivable**" means accounts receivable related to a Preneed Agreement.

"**Preneed Agreement**" means any funeral or cemetery preneed contract, agreement or promise which (i) obligates the Company or the Business to provide for the future delivery of funeral or cemetery merchandise or services and (ii) is unfulfilled in whole or in part.

"**Prepaids**" means all prepaid items, deposits, costs, fees and expenses of the Company related to the Business or Assets.

"**Principal**" has the meaning set forth in the Preamble.

"**Purchase Price**" has the meaning set forth in Section 2.4.

"**Real Property**" means all land used in connection with the operation of the Business together with (i) all buildings, structures, improvements, fixtures, facilities and construction in progress located on such land, including all heating, ventilation, electrical, plumbing and other mechanical or operational systems, (ii) all rights, benefits, privileges, easements, rights-of-way, air rights, use rights, rights to adjacent streets or alleys, riparian rights, water rights, development rights, surface rights, subsurface rights, access rights, reversionary rights and rights under any covenants, conditions or restrictions, benefiting, belonging or pertaining to any part of such land, (iii) all right, title and interest of the Company or other Seller Party in, to and under all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining any of such land, and (iv) all other property around, adjoining or contiguous to any part of such land owned, claimed or used by the Company or other Seller Party used in connection with the operation of the Business.

"**Release**" means spilling, leaking, migrating, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing (including the abandonment or discarding or barrels, containers and other closed receptacles).

"**Retained Assets**" has the meaning set forth in Section 2.2.

"**Retained Liabilities**" has the meaning set forth in Section 2.3(b).

"**Sale Motion**" has the meaning set forth in Section 2.7(a).

886705v17

"**Sale Order**" means a final, non-appealable order, in a form acceptable to Buyer in its sole discretion, pursuant to Sections 105 and 363 of the Bankruptcy Code (i) authorizing and approving the sale of the Seller Parties' assets to Buyer free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f) (other than the Permitted Liens) and pursuant to the terms and conditions set forth herein and (ii) containing certain findings of facts, including a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

"**Seller Indemnitees**" has the meaning set forth in Section 9.2.

"**Seller Party** and **Seller Parties**" has the meaning set forth in the Preamble.

"**Services in Progress**" means any at-need funeral contract that has been entered into by the Company or the Business to provide for imminent funeral services and has a Final Service Date after the Effective Time.

"**Shortfall**" means as of the Effective Time, with respect to each of the Preneed Agreements, the amount by which (i) the amount that has been paid for the applicable insurance policy is less than (ii) the amount required by applicable Laws or contract terms to be paid for the applicable insurance policy.

"**Surveys**" has the meaning set forth in Section 5.6(b).

"**Tax**" means any federal, state, local, foreign or municipal net income, gross income, gross receipts, sales, goods and services, use, ad valorem, transfer, franchise, profits, withholding, payroll, employment, excise, stamp, occupation, property, severance, customs, duties or other tax of any kind whatsoever, together with any interest, penalties, or addition to tax imposed or assessed with respect thereto.

"**Tax Return**" means any return, declaration, report, statement, information statement or similar document filed or maintained, or required to be filed or maintained, with respect to Taxes, including any schedules thereto and any amendments thereof.

"**Third Party Claim**" has the meaning set forth in Section 9.5(a).

"**Title Company**" means First American Title Insurance Company.

"**Title Policies**" has the meaning set forth in Section 5.6(a).

"**Trade Names**" means Poole Funeral Home & Cremation Services, Thomas L. Scroggs Funeral Directors, Cremation Services of Georgia and any variations of such Trade Names.

"**Transaction Documents**" means the agreements, documents and instruments to be executed and delivered at the Closing pursuant to Sections 7.1 and 7.2.

"**Transfer**" has the meaning set forth in the Recitals.

"**U.S. Privacy Laws**" means all rules, regulations, codes, orders, decrees, guidelines, and rulings thereunder of any federal, state, regional, county, city, municipal or local government of

886705v17

the U.S. or any department, agency, bureau or other administrative or regulatory body obtaining authority from any of the foregoing, that relate to privacy, data protection or data transfer issues, or that otherwise relate to the collection, use, processing, storage or transfer of Personal Information, including all implementing Laws, ordinances, regulations, or guidelines and all state privacy, security, data protection and destruction, and data breach notification statutes and regulations, in each case that are applicable to the Company.

SECTION 2
PURCHASE AND SALE OF THE ASSETS AND LIABILITIES; BANKRUPTCY COURT
APPROVAL; CLOSING

2.1.    Sale and Transfer of the Assets.  Subject to the terms and conditions set forth in this Agreement, the Company will, at the Closing, Transfer to Buyer, and Buyer will purchase from the Company, all assets, rights, properties and interests (other than the Retained Assets) owned by the Company or used or held for use in connection with, or that relate to, the Business (the "**Assets**") including, without limitation, the following:

(a)    all Real Property;

(b)    the motor vehicles set forth in Schedule 2.1(b) (the "**Motor Vehicles**"), with such Schedule 2.1(b) identifying which Motor Vehicles are owned or leased and containing copies of the certificate of title for each owned Motor Vehicle;

(c)    all Personal Property;

(d)    all Merchandise Inventory;

(e)    all (i) Preneed Agreements and the related Preneed Accounts Receivable, if any, (ii) rights to life insurance or annuity policy proceeds related to Preneed Agreements and (iii) At-Need Accounts Receivable;

(f)    any Other Contracts;

(g)    all Existing Permits;

(h)    all (i) goodwill associated with the Company and the Business, (ii) Intellectual Property Rights, (iii) all telephone listings, telephone numbers (wired and wireless) used or held for use in the Business and (iv) other information relating to the carrying on of the Business, and all other rights used in connection with the Business;

(i)    all of the Business' rights and incidents of interest in and to causes of action, suits, proceedings, judgments, claims and demands of any nature, whenever maturing or asserted, relating to or arising directly or indirectly out of the Assets or the Business, including, without limitation, all interests in and rights to claims under insurance policies and insurance contracts and claims thereunder;

(j)    all documents, records, files and reports, whether written, printed or electronically stored, related to the Business or the Assets, including, but not limited to,

886705v17

general business records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Rights; *provided*, *however*, that the Company shall be entitled to retain all books of account, ledgers, and general, financial, tax, and accounting records of the Company; all strategic plans, forecasts, budgets, and internal financial statements of the Company; any records or correspondence that relate to the Company as a legal entity or to any business other than the Business; and any records that the Company is required by Law to retain, subject to Buyer's right to obtain copies of any such retained records to the extent relating to the Business or the Assets;

(k)      all Prepaids as of the Effective Time; and

(l)      all revenue associated with Services in Progress.

To the extent that any Assumed Contract or Existing Permit included in the Assets is not capable of being validly Transferred to Buyer ("**Non-Assignable Assets**") without Consent or that any such Transfer or attempted Transfer without such Consent would constitute a breach thereof or a violation of any Laws, this Agreement shall not constitute a Transfer by Seller Parties or an assumption by Buyer thereof.  From and after the Closing Date, to the extent that any Consents that are necessary for the valid Transfer to Buyer of all Non-Assignable Assets is not obtained by Seller Parties prior to the Closing Date, Seller Parties will use their commercially reasonable efforts, to obtain such Consents, and further, Seller Parties shall (i) provide to Buyer the financial and business benefits of any Non-Assignable Asset, (ii) cooperate in any reasonable and lawful arrangement designed by Buyer to provide such benefits to Buyer, and (iii) enforce, at the request of Buyer for the account of Buyer, any rights of the Company under any such Non-Assignable Asset (including the right to elect to renew, extend or terminate any of the foregoing in accordance with the terms thereof).

2.2.      Retained Assets.  Notwithstanding anything to the contrary set forth in Section 2.1, the properties, assets, rights and interests set forth in Schedule 2.2 will be retained by the Company and will not be included in the Assets to be Transferred to Buyer (collectively, the "**Retained Assets**").

2.3.      Assumed Liabilities.

(a)      Subject to the terms and conditions of this Agreement, at the Closing Buyer will assume and thereafter in due course pay, perform and discharge the following, and only the following, liabilities and obligations of the Company (collectively, the "**Assumed Liabilities**") which relate to the Business or Assets:

(i)      all liabilities and obligations of the Company or the Business arising under the terms of or in connection with the Assumed Contracts but only to the

886705v17

extent such liabilities and obligations arise, accrue and first become due after the Effective Time under the terms of the Assumed Contracts; *provided, however,* that Buyer will not assume or be responsible for any such liabilities or obligations which relate to any breach or default by the Company or the Business under any Assumed Contract that occurred prior to the Effective Time or arise out of or relate to events or circumstances that occur or exist prior to the Effective Time, including, for the avoidance of doubt, any cure costs, cure amounts, defaults, arrearages, adequate assurance payments, or other amounts of any kind arising under or relating to any Assumed Contracts, or for any commission chargebacks that are related to Preneed Agreements sold or related life insurance policies issued prior to the Effective Time, all of which liabilities and obligations will constitute Retained Liabilities. Notwithstanding anything to the contrary contained in this Agreement or any Transaction Document, Buyer's obligations with respect to the Assumed Liabilities will not be greater than the Company's obligations thereunder and will be subject to Buyer's right to contest in good faith the nature and extent of any such liability or obligation;

(ii)     all obligations of the Company or the Business to pay for merchandise related to Services in Progress; and

(iii)    all costs associated with the repair of the retort located at the Business.

(b)     Except for those Assumed Liabilities set forth in Section 2.3(a), the Company will retain, and Buyer will not assume or be responsible or liable with respect to, any liabilities or obligations of Seller Parties, that are based in whole or in part on events or conditions that occurred or existed prior to the Effective Time, whether or not arising out of or related to the conduct of the Business or associated with or arising from the Assets, whether fixed or contingent, known or unknown or incurred or accrued, including for the avoidance of doubt, (i) any unclaimed cremated remains located at the Business as of the Effective Time and (ii) all costs, fees and penalties, including costs incurred with remediation, in connection with any building or fire code violation existing as of the Effective Time (all items under this Section 2.3(b), the "**Retained Liabilities**").

2.4.    Purchase Price.  In consideration of the Transfer of the Assets and the other undertakings of Seller Parties under this Agreement, including execution of the Non-Competition Agreement, in addition to assuming the Assumed Liabilities, at the Closing Buyer will pay to the Company by wire transfer of immediately available funds to an account designated by Seller Parties, an aggregate purchase price of (a) $5,550,000.00 and (b) $[_____][1] in consideration for the At-Need Accounts Receivable, subject to (i) escrow of the Holdback Amount provided in Section 2.9 and (ii) the adjustments as provided in Section 2.5 (collectively, the "**Purchase Price**").

2.5.    Prorations and Adjustments to Purchase Price.  All personal and real property taxes, rents under leases, and utility bills payable with respect to the Assets which are unpaid on the

---

[1] **Note to Draft**: To be a 10% discount to the value of A/R before closing aged 30 days or less.

886705v17

Closing Date shall be prorated between the Company and Buyer as of the Closing Date based on the best evidence then available (such prorations to be adjusted within ninety days after actual figures are received, and there shall then be a cash settlement between the Company and Buyer). All such prorated items attributable to the period that ends on the Closing Date, which remain unpaid as of the Closing Date, shall be deducted from the Purchase Price and shall be paid by Buyer on the Company's behalf. Revenues from Services in Progress will be allocated to Buyer. All direct costs for merchandise paid to third parties associated with Services in Progress will also be allocated to Buyer.

2.6.    Purchase Price Allocation.   The parties agree that the dollar amounts for each category of Assets set out in Exhibit A to this Agreement fairly reflect the fair market value of each such category of Assets.  Buyer and Seller Parties shall report, act and file all Tax Returns in all respects and for all purposes consistent with such allocation.  Seller Parties shall timely and properly prepare, execute, file and deliver all such documents, forms, and other information as Buyer may reasonably request to prepare such allocation.  Neither Buyer nor Seller Parties shall take any position that is inconsistent with such allocation unless required to do so by applicable Law.

2.7.    Bankruptcy Court Approval.

(a)    Sale Motion.  Prior to the Closing, the Seller Parties shall file a motion (the "**Sale Motion**") with the Bankruptcy Court, seeking an entry of the Sale Order approving the sale of the Assets to Buyer pursuant to this Agreement under 11 U.S.C. § 363.

(b)    Sale Order.  The obligation of Buyer to close under this Agreement is subject to the Bankruptcy Court's approval and entry of the Sale Order.

(c)    No Successor Liability.  The parties agree that the Sale Order shall provide that to the fullest extent permitted under Section 363(f) of the Bankruptcy Code, (a) Buyer shall not be liable for any liability or lien (other than those to be expressly assumed hereunder) against the Assets, the Seller, or any of its predecessors; and (b) Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Assets arising on or prior to the Closing Date.

(d)    Good Faith Purchaser.  The parties agree that the transactions contemplated by this Agreement are undertaken by Buyer in good faith, as that term is used in 11 U.S.C. § 363(m).  Buyer is acquiring the Assets for value, in good faith, and without collusion with the Seller Parties, any creditor, or any other party in interest, or any insider thereof, within the meaning of Section 363(m) of the Bankruptcy Code. The parties agree that the Sale Order shall include an express finding that Buyer is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to all protections afforded thereby.

2.8.    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place via email, facsimile and telephone conference on the Closing Date. Seller Parties will cease doing business at 11:59 p.m. on the day before the Closing Date and the

886705v17

Transfer will be effective as of 12:01 a.m., local time where the Business is located, on the Closing Date (the "**Effective Time**").

2.9.    Holdback Amount.  An amount equal to $350,000.00 (the "**Holdback Amount**") shall be withheld from payment to the Company on the Closing Date and held back by Buyer to satisfy any amounts owed by any Seller Party to any Buyer Indemnitee pursuant to Section 9.  The Holdback Amount shall be released as follows:

(a)    On the 12-month anniversary of the Closing Date, Buyer shall release to the Designated Recipient an amount equal to (i) $70,000 of the then-remaining Holdback Amount, as adjusted pursuant to Section 2.9(f), minus (ii) the aggregate amount of all unresolved claims under Section 9 asserted by a Buyer Indemnitee prior to such date.

(b)    On the 24-month anniversary of the Closing Date, Buyer shall release to the Designated Recipient an amount equal to (i) $70,000 of the then-remaining Holdback Amount, as adjusted pursuant to Section 2.9(f), minus (ii) the aggregate amount of all unresolved claims under Section 9 asserted by a Buyer Indemnitee prior to such date.

(c)    On the 36-month anniversary of the Closing Date, Buyer shall release to the Designated Recipient an amount equal to (i) $70,000 of the then-remaining Holdback Amount, as adjusted pursuant to Section 2.9(f), minus (ii) the aggregate amount of all unresolved claims under Section 9 asserted by a Buyer Indemnitee prior to such date.

(d)    On the 48-month anniversary of the Closing Date, Buyer shall release to the Designated Recipient an amount equal to (i) $70,000 of the then-remaining Holdback Amount, as adjusted pursuant to Section 2.9(f), minus (ii) the aggregate amount of all unresolved claims under Section 9 asserted by a Buyer Indemnitee prior to such date.

(e)    On the 60-month anniversary of the Closing Date, Buyer shall release to the Designated Recipient an amount equal to (i) $70,000 of the then-remaining Holdback Amount, as adjusted pursuant to Section 2.9(f), minus (ii) the aggregate amount of all unresolved claims under Section 9 asserted by a Buyer Indemnitee prior to such date.

(f)    Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy it has or may have, Buyer has the right to set off and recoup any amounts for resolved claims under Section 9 any Seller Party owes any Buyer Indemnitee against the Holdback Amount or any portion thereof ("**Buyer's Set Off Right**").  When Buyer exercises Buyer's Set Off Right, the amount of the Holdback Amount available to be distributed under Sections 2.9(a) – 2.9(e) shall be reduced on a dollar-for-dollar basis.  Buyer's Set Off Right shall be applied to the Holdback Amount first with respect to Section 2.9(a), second with respect to Section 2.9(b), third with respect to Section 2.9(c), fourth with respect to Section 2.9(d) and last with respect to Section 2.9(e).

(g)    If any amount of the then-remaining Holdback Amount becomes available to distribute to the Company after the 60-month anniversary of the Closing Date due to a claim under Section 9 asserted by a Buyer Indemnitee being resolved, Buyer shall release such amount to the Designated Recipient in a commercially reasonable timeframe.

886705v17

SECTION 3
REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

The Seller Parties, jointly and severally, hereby represent and warrant to Buyer, as of the Closing Date, as follows, except as modified by the disclosure schedules accompanying this Agreement (the "**Disclosure Schedules**"):

3.1.     Recitals.  Recitals A through C are incorporated into the body of this Agreement as if set forth in this Section 3.1.

3.2.     Organization; Power and Authority.  Each of Laurenbrook, Poole FH and PFH Holdings is duly organized, validly existing and in good standing under the Laws of the State of Georgia, and has the requisite power (corporate or otherwise) and authority to own, operate and lease its properties and to carry on its Business as it is presently being conducted.  Each of Laurenbrook, Poole FH and PFH Holdings is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business or location of its properties makes such qualification necessary.

3.3.     Validity of Agreement.  This Agreement and all other Transaction Documents to which Seller Parties are a party constitute the legal, valid and binding obligation of each of the Seller Parties, enforceable against them in accordance with their terms. Each of Laurenbrook, Poole FH and PFH Holdings has the requisite power (corporate or otherwise) and authority to enter into this Agreement and any Transaction Documents to which it is or will be a party and to undertake and perform fully the transactions contemplated hereby.  All necessary action (corporate or otherwise) has been taken by and on behalf of each of Laurenbrook, Poole FH and PFH Holdings with respect to the authorization, execution, delivery and performance of this Agreement and any Transaction Documents to which it is or will be a party.  The Principal has full capacity, authority and right to execute and deliver this Agreement and the Transaction Documents to which it is or will be a party and to undertake and perform the transactions contemplated hereby.  The Transaction Documents will constitute the legal, valid and binding obligations of each Seller Party, enforceable in accordance with their respective terms.

3.4.     No Breach; Consents.  Neither the execution and delivery of this Agreement by any of the Seller Parties or of the Transaction Documents to which it is or will be a party, nor the performance of their respective obligations hereunder or thereunder, will:

(a)     violate, conflict with or result in a breach of the organizational documents of Laurenbrook, Poole FH or PFH Holdings or resolutions of the shareholders or board of directors of Laurenbrook, Poole FH or PFH Holdings;

(b)     violate any Law;

(c)     conflict with or result in a breach of or termination of, or otherwise give any contracting party additional rights to compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of, any Assumed Contract or any other note, deed, lease, instrument, security agreement, intercreditor agreement, court order, mortgage, commitment, contract, agreement, license

886705v17

or other instrument, whether written or oral, expressed or implied, to which any of the Assets or the Business is bound; or

(d)     result in the creation or imposition of any Liens with respect to, or otherwise have a Material Adverse Effect upon, the Assets or the Business.  Except for those consents, approvals, authorizations or filings previously obtained, satisfied or made, or those set forth in Schedule 3.4(d), no Consent is required to be obtained, satisfied or made pursuant to any Laws, Permits, Assumed Contracts or other agreements by which any Seller Party, or any of their properties or assets, including the Assets, is bound in connection with (i) the execution and delivery of this Agreement or any Transaction Document by any Seller Party, or (ii) the consummation of the transactions contemplated by this Agreement and the Transaction Documents by any Seller Party.

3.5.     Title and Condition of Assets.

(a)     Schedule 3.5(a) sets forth a correct and complete list of all tangible Personal Property, other than Retained Assets, owned or leased by the Company and used in connection with the Business, but excluding the Motor Vehicles set forth in Schedule 2.1(b).

(b)     The Company has good and marketable title to all of the Assets, free and clear of all Liens, except for Permitted Liens. Title to all of the Assets is capable of Transfer and assignment to Buyer without notice or Consent of any other Person.  At the Closing, Buyer will acquire good and marketable title to all of the Assets, in each case free and clear of any and all Liens, except for Permitted Liens.

(c)     Except as disclosed in Schedule 3.5(c), the Assets are (i) in good condition and repair, ordinary wear and tear excepted, as necessary for the uses for which they are currently used in the Business, (ii) all of the assets, properties, rights, licenses or Permits of any kind owned, held or used in the conduct of the Business as it is currently conducted, and (iii) sufficient for the operation of the Business as it is currently conducted.  None of the Retained Assets are material to the Business.

3.6.     Real Property.  Schedule 3.6 sets forth a correct and complete list and description of all real properties, owned by PFH Holdings or used by the Company in connection with the Business.  PFH Holdings has good and marketable title to all of the Real Property, free and clear of all Liens, except for Permitted Liens.  Title to all of the Real Property is capable of Transfer and assignment to Buyer without notice or Consent of any other Person. The Church Lease is valid and in full force and effect.  Neither the Company nor any other Person is in default under the Church Lease, and no event has occurred which, with the giving of notice or the passage of time, or both, would constitute a default by the Company or any other Person under the Church Lease.  With respect to the Real Property and except as disclosed in any property condition assessment commissioned by Buyer or any Affiliate of Buyer:

(a)     no portion of the Real Property is subject to any pending or, to the Knowledge of the Seller Parties, threatened condemnation or other proceeding by any Governmental Authority;

886705v17

(b)    the structures, improvements and fixtures at or upon the Real Property, including, but not limited to, roofs and structural elements thereof and the electrical, plumbing, heating, ventilation, air conditioning, crematory retort, and similar units and systems, have been and currently are reasonably maintained and are in good operating condition, ordinary wear and tear excepted, for their intended use subject to the provision of usual and customary maintenance and repair performed in the Ordinary Course with respect to similar properties of like age and construction;

(c)    all facilities located on the Real Property are supplied with utilities and other services necessary for the operation of those facilities as presently operated, and all of such services are adequate to conduct the Business as currently operated;

(d)    none of the Real Property is located in an area for which federal flood risk insurance is necessary;

(e)    no notice of any increase in the assessed valuation of the Real Property and no notice of any contemplated local improvement charges, levies or special assessment has been received by any Seller Party and, to the Knowledge of Seller Parties, there are no threatened improvement charges, levies or special assessments pertaining to any of the Real Property;

(f)    except for the Church Lease, which does not interfere with the Ordinary Course operations of the Business, there are no contracts, leases or agreements to which any of the Seller Parties is a party or by which any of the Real Property is bound, granting to any Person the right of use or occupancy of any portion of the Real Property;

(g)    no Person other than the Company is in possession of the Real Property;

(h)    all accounts for work and services ordered or performed and materials ordered, placed or furnished upon or in respect of the Real Property are fully paid and satisfied and no Person is entitled to a claim of any builders', mechanic's or materialman's liens; and

(i)    as of the Effective Time, none of the Permitted Liens will interfere with or prevent the continuation or expansion of current operations or the conduct of planned future operations of the Business on the Real Property.

3.7.    <u>Environmental Issues</u>. Except as disclosed in any environmental site assessment commissioned by Buyer or any Affiliate of Buyer,

(a)    The Company has been and currently is in compliance in all material respects with all Environmental Requirements, including obtaining, maintaining and complying with all Environmental Permits.

(b)    There has been no Release or, to the Knowledge of Seller Parties, threatened Release of any Hazardous Materials (i) at, on, under, to or from the Real Property or the Assets during the period of ownership, (ii) from the operations of the Company or the Business or (iii) at,

886705v17

on, to or from any other location where Hazardous Materials were disposed of, transported to or transferred from any operations of the Company or the Business.

(c)      There is no pending or, to the Knowledge of Seller Parties, threatened litigation or other similar matters pursuant to or relating to Environmental Requirements or any other Law relating to pollution or Hazardous Materials with respect to or affecting the Assets, the Company, the Business or the Real Property. Seller Parties have not received any written notice from any Governmental Authority having jurisdiction over the Real Property relating to any alleged, actual or potential violation of Environmental Requirements or any liability under Environmental Requirements or relating to a request for information or alleging liability or potential liability under CERCLA or analogous state or local Laws.

(d)      Seller Parties have delivered to Buyer true and complete copies of any and all reports, studies, analyses, tests or monitoring pertaining to Hazardous Materials or Environmental Requirements (including compliance with Environmental Requirements) in relation to the Assets, the Business, or the Real Property, of any Environmental Permits or any reports required to be made or maintained under such Environmental Permits.

3.8.    Contracts.   Schedule 3.8 sets forth a complete and accurate list of each Other Contract.  Except as disclosed in Schedule 3.4(d) or Schedule 3.8:

(a)      all of the Assumed Contracts are capable of Transfer and assignment to Buyer without notice to or Consent of any other Person, and are in full force and effect;

(b)      there exists no default or breach thereunder by any party thereto;

(c)      no Seller Party has received any notice claiming that the Company or the Business has committed any such default or breach or indicating the desire or intention of any party thereto to amend, modify, rescind or terminate any Assumed Contract; and

(d)      there are no contracts that are material to the operation of the Business or the value of the Assets other than the Assumed Contracts.

3.9.    Preneed Agreements.

(a)      Seller Parties and the Business have complied with the terms and conditions of the Preneed Agreements and all Laws related thereto.  The forms of each of the Preneed Agreements are in compliance with all Laws related thereto. Seller Parties are not in default or breach of any Preneed Agreement.  All Preneed Agreements are properly funded by an insurance policy.  None of the Preneed Agreements are funded by trust and the Company has no Merchandise and Services Trusts. All funds received by Seller Parties or the Business in connection with Preneed Agreements have been set aside and identified on Schedule 3.9(c).

(b)      Seller Parties have provided discounts on Preneed Agreements only in the Ordinary Course.  The total amount of all discounts (in the aggregate) does not exceed more than 10% of the pre-discount sale amount of all Preneed Agreements.

886705v17

(c)   Schedule 3.9(c) shall identify all of the Business' Preneed Agreements and shall include the name of the insured, the issue date, the face amount and the current death benefit.  All of the Preneed Agreements are in full force and effect.

3.10.   Permits; Compliance with Laws.

(a)   Schedule 3.10(a) sets forth a full, complete and accurate list of all Permits required or necessary for the conduct of the Business under any applicable Law.  Except as disclosed in Schedule 3.10(a), all the Existing Permits are in full force and effect.  There are no material restrictions on the Company's ability to Transfer or assign any Permits to Buyer or Buyer's ability to renew any of the Existing Permits. The consummation of the transactions contemplated hereby will not conflict with the terms of, result in default under, or violate the terms of, any Existing Permit or result in the termination of, or require any Consent or other action pursuant to, any of the Existing Permits. The Company is in full compliance with all Existing Permits.

(b)   The Company is in material compliance with all Laws applicable to the Business and neither the Company nor the Business has received any notice of any alleged noncompliance relating to the Business during the preceding three years and any such notice ever that has not been cured, including without limitation (i) the Federal Trade Commission's Funeral Industry Practices Regulation, (ii) OSHA, and (iii) ADA.

(c)   The Company has complied with all Laws and contractual obligations with respect to its storage, handling and disposal of cremated remains and there are no unclaimed cremated remains located at the Business other than those set forth in Schedule 3.10(c).

3.11.   Past Business Practices.  The services provided by the Business during the five years preceding the date of this Agreement have been rendered in a professional and competent manner consistent with prevailing professional standards, practices and customs relating to said practices prevailing in the greater Atlanta, Georgia market, at the time the services were rendered. No Business or any other Person acting on their behalf has, during the preceding five years, made any payment to any government official, employee, representative or agent to induce the recipient or the recipient's employer to do business with, grant favorable treatment to or compromise or forego any claim against the Business.

3.12.   Litigation.  There is no litigation, action, suit, judgment, investigation, claim or proceeding pending, affecting or, to the Knowledge of the Seller Parties, threatened against any of the Seller Parties, or any of their properties or assets, including the Assets, either at law or in equity, before any Governmental Authority or any arbitration panel which, if adversely determined, would have a Material Adverse Effect on the value of the Assets to Buyer or on Buyer's ability to conduct the Business.  To the Knowledge of Seller Parties, there are no facts or circumstances or other events which have occurred or may reasonably be expected to occur that can be expected to give rise to any such litigation.

3.13.   Taxes.  All Tax Returns required to be filed with respect to the Assets or the operations of the Business have been filed and all such Tax Returns are correct and complete in

886705v17

all material respects and were prepared in substantial compliance with all applicable Law. All Taxes shown to be due and payable on such Tax Returns have been paid. All Taxes with respect to the Assets or the operations of the Business which the Company is required by Law to withhold or to collect for payment have been duly withheld and collected and remitted to the proper Governmental Authority. There is not any liability for Taxes arising out of, or attributable to, or affecting the Assets or the operations of the Business through the Effective Time, or attributable to the conduct of the operations of the Company at any time, for which Buyer will have any liability for payment or otherwise. After the Closing, there will not exist by virtue of the transactions contemplated by this Agreement any liability for Taxes which may be asserted by any Governmental Authority against the Assets or the operations of the Business, and no Lien for Taxes will attach to the Assets or the operations of the Business.

3.14. <u>Financial Statements</u>. Attached as <u>Schedule 3.14</u> are the unaudited financial statements of the Company for the years ended December 31, 2023, December 31, 2024, and December 31, 2025 (the "**Financial Statements**"). The Financial Statements are true and correct in every material respect, have been prepared by Seller Parties throughout the periods indicated on a consistent basis, and present fairly the financial position, results of operations and cash flows of the Company as of the respective dates of the balance sheets included in the Financial Statements and the results of its operations for the respective periods indicated. There are no additional sets of books, duplicate sets, "second sets" or other documents or records of the Company kept by or for any of the Seller Parties which purport to show the financial condition of the Company that have not been delivered to or inspected by Buyer.

3.15. <u>Labor Relations</u>. No employee of the Company that is employed in the Business is a party to any collective bargaining agreement or union contract and no Seller Party is aware of any current union organization effort with respect to its employees. During the most recent two-year period, no Seller Party has received any notice of any unfair labor practice complaints. During the most recent two-year period, no Seller Party has received any notice of, and there have not been, any strikes, slowdowns, work stoppages or lockouts, or threats of any of the foregoing, by or with respect to any of their employees. The Business is not liable for any unfunded pension liability and the consummation of the transaction contemplated hereby shall not constitute a triggering event that would require any such payment. There is no worker's compensation liability, experience, or matter outside the Ordinary Course.

3.16. <u>Employees and Employee Plans</u>. <u>Schedule 3.16</u> lists: (a) all employees of the Company, their wages and remuneration of every kind, including current year vacation pay earned to date, and the date and amount of the latest wage increase for each such employee, and (b) all Employee Plans. No Seller Party has taken any action directly or indirectly to obligate the Company to adopt any additional Employee Plans. Seller Parties have furnished to Buyer true, correct and complete copies (or, if oral, written descriptions) of the Employee Plans, including any amendments thereto, together with true, correct and complete copies of any related trust agreements and other related documents. The Company has complied with all material terms and conditions of the Employee Plans. As of the Effective Time, all vested and nonvested benefits accrued under the Employee Plans shall be fully funded or provision made therefor. No legal action, suit, investigation, complaint, claim (other than claims for benefits submitted by participants or beneficiaries in the normal course) or proceeding is pending or, to the Knowledge of Seller Parties, threatened with respect to the Employee Plans. The Employee Plans have been

886705v17

maintained in full compliance with all applicable Laws, including ERISA.  There are no existing facts or conditions which could give rise to any successor liability on the part of Buyer or any of its Affiliates in connection with the Employee Plans or any amendment or termination thereof.  None of the Assets is encumbered by any Lien arising out of or relating to the existence of any Employee Plan.  The Business is and has been operated in compliance with all Laws respecting employment and employment practices, terms and conditions of employment, wages and hours.

    3.17.  Intellectual Property Rights.

    (a)  The Intellectual Property Rights set forth in Schedule 3.17(a) constitute the only intellectual property or proprietary rights owned by the Company or used or held for use by the Company in or in connection with the conduct of the Business, and the Intellectual Property Rights constitute all of the intellectual property and proprietary rights necessary to conduct the Business as now conducted.  The Company owns and has the exclusive right to Transfer to Buyer the Intellectual Property Rights free and clear of all Liens and free from any past, present or future royalty payments, license fees, charges or other payments, conditions or restrictions.  At the Closing, title to the Intellectual Property Rights will vest exclusively in Buyer.  To the Knowledge of Seller Parties, there is no unresolved claim or demand by any third party asserting a conflict with the rights of others in connection with the Company's use of any of the Intellectual Property Rights in the conduct of the Business.  The conduct of the Business does not infringe on and no claim or allegation has been made that the conduct of the Business infringes on, any trademark, trade name, service mark, patent, invention, know-how, copyright, confidential business information, trade secret, proprietary information, industrial design, drawing, process, or formula owned or licensed by any third party.  None of the Intellectual Property Rights are subject to any outstanding Order, ruling, decree, judgment or stipulation by or with any court, tribunal, arbitrator or other Governmental Authority.

    (b)  Seller Parties have the legal right to use the Trade Name in the trade areas in which such names are utilized in the Business.

    3.18.  Insurance.  The Company maintains insurance in such amounts, and in respect of such risks, as are prudent for the Business conducted by the Company.  Copies of all insurance policies of the Business currently in force and a list of all liability insurance policies including general, professional and umbrella liability policies for the previous five years are included on Schedule 3.18.

    3.19.  Brokers.  No Seller Party, nor any Person acting on their behalf, has taken any action that would directly or indirectly obligate Buyer or any Affiliate of Buyer to any Person acting as a broker, finder, financial advisor or in any similar capacity in connection with this Agreement or the transactions contemplated by this Agreement. The Foresight Companies LLC is acting as Seller Parties' broker.

    3.20.  Inventories.  Schedule 3.20 sets forth a list of the Merchandise Inventory of the Business as of the Closing Date or such other date stated in such schedule.  The Merchandise Inventory of the Business as shown on the Financial Statements is reflected at cost.

886705v17

3.21.   <u>At-Need Accounts Receivable</u>.   <u>Schedule 3.21</u> sets forth a list of all At-Need Accounts Receivable of the Business as of the Closing Date or such other date stated in such schedule. All At-Need Accounts Receivable aged 30 days or less represent bona fide sales actually made in the Ordinary Course and are collectible in the Ordinary Course, without set off or counterclaim.  To the actual knowledge of Seller Parties, none of the account debtors of the At-Need Accounts Receivable aged 30 days or less is involved in a bankruptcy or insolvency proceeding or is generally unable to pay its Debts as they become due.  The Business has good and valid title to the At-Need Accounts Receivable aged 30 days or less free and clear of all restrictions, liens, claims and encumbrances.  No goods or services, the sale or provision of which gave rise to any At-Need Accounts Receivable aged 30 days or less, have been returned or rejected by any account debtor or lost or damaged prior to the receipt thereby.

3.22.   <u>Warranties</u>.  Neither the Company nor the Business has given or made any express warranties to third parties with respect to any merchandise sold or services performed by the Business.  To the Knowledge of Seller Parties, there is no statement of facts or occurrence of any event which could form the basis of a claim against the Company or the Business for liability on account of any express or implied warranty.

3.23.   <u>Privacy and Data Security</u>.

(a)   The Company is in material compliance with all Laws (including U.S. Privacy Laws) and contractual and fiduciary obligations as to protection and security of Personal Information to which it is subject.

(b)   No notices, claims, investigations or proceedings by any Governmental Authority or other Person alleging (i) a material violation of any Person's privacy rights or (ii) unauthorized access, use or disclosure of Personal Information has been asserted or, to the Knowledge of Seller Parties, threatened to the Company.

(c)   Since January 1, 2020, there has not been a material violation by the Company of any Person's privacy rights or any unauthorized access, use or disclosure by the Company of Personal Information or confidential or proprietary information of the Company (or of any third party that the Company maintains).

(d)   To the Knowledge of Seller Parties, the Company's Information Systems are reasonably sufficient for the needs of the Business.

(e)   The Company has the full power and authority to transfer to Buyer any and all rights of the Company in any Personal Information in its possession or control. There is no obligation or limitation, imposed by U.S. Privacy Laws or otherwise, that would prevent Buyer following the Closing from using such Personal Information in a manner consistent with the Business as it is currently conducted.

3.24.   <u>Absence of Certain Changes or Events</u>.

(a)   Since June 30, 2025, no event or events have occurred or condition or conditions exist that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on the Business, nor have any events

886705v17

occurred nor do there exist any circumstances which would reasonably be expected to result, either before or after the Closing, in any Material Adverse Effect.

(b)      Since June 30, 2025, the Business has been conducted in all material respects in the Ordinary Course.

(c)      Since June 30, 2025, the Company has not changed any Tax or financial accounting methods, principles or practices of the Company affecting the Assets or the Business, including any reserving, renewal or residual method, practice or policy.

(d)      Since June 30, 2025, no change has occurred which materially and adversely affects the Assets or the liabilities or stockholders' equity of Seller Parties, nor have any events occurred nor do there exist any circumstances which would reasonably be expected to result, either before or after the Closing, in any Material Adverse Effect.

3.25.   <u>Certain Service Information</u>.  <u>Schedule 3.25</u> sets forth, for each of the preceding three fiscal years, the total number of services performed by the Company, categorized by the type of service as follows: (a) service calls (i.e., casketed services, cremations and ship-ins/ship-outs) and (b) trade work and other services (i.e., third party cremations, trade embalmings, and other miscellaneous services greater than $250 per transaction in revenue).

3.26.   <u>No Reliance</u>.  Except for the representations and warranties of the Seller Parties set forth in this Agreement (as supplemented or modified by the Disclosure Schedules) or any Transaction Document, Buyer acknowledges that (a) neither the Seller Parties, any of their respective Affiliates nor any other Person has made any representation or warranty (whether express or implied) on behalf of the Seller Parties, any of their Affiliates or any of their respective representatives in connection with this Agreement or the Seller Parties' business, their financial condition, results of operations, future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects) or the accuracy or completeness of any information regarding the Seller Parties, or their business, furnished or made available to Buyer and its Affiliates and representatives, and (b) Buyer has not relied on any representation or warranty from the Seller Parties or any of their respective Affiliates in determining to enter into this Agreement; *provided*, *however*, that nothing in this Agreement shall limit or exclude liability for fraud.

SECTION 4
<u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer hereby warrants and represents to the Seller Parties, as of the Closing Date, as follows:

4.1.   <u>Organization; Power and Authority</u>.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware, and has the requisite power and authority to own, operate and lease its properties and to carry on its business as presently being conducted.

886705v17

4.2.     Validity of Agreement.  This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.  Buyer has the limited liability company power and authority to enter into this Agreement and to undertake and perform fully the transactions contemplated hereby.

4.3.     Brokers.  Neither Buyer nor any Person acting on its behalf has taken any action that would directly or indirectly obligate Seller Parties to any Person acting as a broker, finder, financial advisor, or in any similar capacity in connection with this Agreement or the transactions contemplated by this Agreement.

SECTION 5
CERTAIN COVENANTS OF SELLER PARTIES AND BUYER

5.1.     Goodwill.  Seller Parties will use their commercially reasonable efforts to protect the ongoing goodwill of the Business after the Closing Date.

5.2.     Cooperation.  Seller Parties shall use commercially reasonable efforts and fully cooperate with Buyer to swiftly effect all Transfers of transferrable Existing Permits and/or assist Buyer with its applications for any Permit that must be obtained after the Closing as necessary for Buyer to own or operate the Business.  Seller Parties agree to use commercially reasonable efforts to immediately take, or cause to be taken, all actions and to do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.  Seller Parties shall use commercially reasonable efforts to defend any lawsuits or other legal proceedings brought against Seller Parties, and to jointly defend (pursuant to a mutually agreeable joint defense agreement) any lawsuits or other legal proceedings brought against both Buyer and any Seller Party, in each case, whether such lawsuits or legal proceedings are judicial or administrative, whether brought derivatively or on behalf of third parties (including governmental agencies or officials), challenging this Agreement or the consummation of the transactions contemplated hereby. Notwithstanding anything to the contrary in this Agreement, the Seller Parties agree that, after the Closing, Buyer shall be entitled to operate the Business under the Seller Parties' existing Permits until such time as Buyer has secured all approvals and Permits required for operation of the Business in Georgia.

5.3.     Public Announcements.  After the Closing Date, Buyer and Seller Parties will consult and agree in writing, such agreement not to be unreasonably withheld, prior to the issuance of any press release statement relating to the transactions contemplated by this Agreement or making of any related public statement.

5.4.     Further Assurances.  From and after the Closing Date, Seller Parties will execute all documents and do all such further deeds, acts, things and assurances that may be reasonably requested by Buyer for more perfectly and absolutely assigning, Transferring, assuring to and vesting in Buyer title to the Assets, free and clear of all Liens (except Permitted Liens), and for carrying out the intention of or facilitating the performance of the terms of this Agreement.

5.5.     Access to Information.

(a)     Subject to the consent of Buyer, after the Closing Date, the Seller Parties may obtain from Buyer a copy of certain categories of Company data, which may include

886705v17

Personal Information, in existence prior to the Closing Date, in electronic form in a format used by the parties (the "**Company Data**"), under the following conditions:

(i)　　The period of time in which Seller Parties may request a copy of the Company Data is limited to sixty days after the Closing Date.

(ii)　　Seller Parties' access to the Company Data is for the limited purposes of records retention, compliance with applicable Law and the audit requirements of Section 8.2, and the transfer of any Personal Information from Buyer to Seller Parties shall only be for the limited purposes.

(iii)　　Seller Parties' access to Company Data is subject to the confidentiality provisions in this Agreement.

(iv)　　Access to any Personal Information shall be strictly limited to the Seller Parties and their attorneys, accountants and other representatives with a need-to-know basis, as strictly necessary for the limited purposes, ensuring that all such Persons are subject to enforceable contractual or statutory obligations of confidentiality.

(b)　　Seller Parties and Buyer shall protect any Personal Information that it receives from the other party in accordance with applicable U.S. Privacy Laws.

5.6.　　Title Insurance and Survey.

(a)　　Buyer has prior to the Closing, at its sole cost and expense, obtained preliminary title reports for owner's policies of title insurance for the Real Property, from the Title Company, along with copies of all documents and instruments reflecting items noted as exceptions to title (the "**Preliminary Title Reports**"). The Preliminary Title Reports will be in sufficient detail to provide the basis for the issuance of ALTA Extended Owner's Form B Policies of Title Insurance or its equivalent from the Title Company (the "**Title Policies**").

(b)　　Buyer has prior to the Closing, at its sole cost and expense, obtained ALTA surveys of the Real Property in forms sufficient to enable the Title Company to delete from the Title Policies the standard exception for matters disclosed by an accurate survey (the "**Surveys**").

(c)　　Any exceptions, encumbrances, encroachments, overlaps, protrusions, boundary line disputes or other matters shown in the Preliminary Title Reports and the Surveys that are not cured or removed from the Title Policies shall be Permitted Liens.

(d)　　At the Closing, Buyer will receive, at its sole cost and expense, the Title Policies or a binding undertaking from the Title Company to issue such policies, insuring that fee simple title to the Real Property is vested in Buyer. The Title Policies will contain no exceptions other than the Permitted Liens (including any commonly called "standard exceptions") and will insure fee simple title to the Real Property in Buyer with such

886705v17

affirmative endorsements as may be requested by Buyer, including, but not limited to, zoning (Form 3.1), survey, access and contiguity.

5.7.    <u>Environmental Audit</u>.  Prior to the Closing, Buyer may, at its sole cost and expense, perform ASTM phase I environmental audits of the Real Property.

5.8.    <u>Preneed Agreements and Trust Funds</u>.  After the Closing, upon receipt of written notice from Buyer, the Seller Parties will indemnify and pay to Buyer the amount of any Shortfall. The Company at the Closing will assign to Buyer its rights under the insurance policies relating to the Preneed Agreements and will execute all necessary documentation that Buyer may require with respect to such assignment.  In the event it is necessary to notify the beneficiaries of the Preneed Agreements respecting the assignment of the Preneed Agreements, Buyer will, with the Seller Parties' full cooperation, make all arrangements respecting the delivery and content of the notices.

5.9.    <u>Use of Name</u>.  Seller Parties agree that from and after the Closing, they will not use the Trade Name in any form or medium and will change the name of Poole FH accordingly.

5.10.    <u>Non-Competition Agreement</u>.  At the Closing, the Principal will by separate agreement grant to Buyer a covenant not to compete (the "**Non-Competition Agreement**").

5.11.    [Reserved].

5.12.    <u>1031 Exchange</u>.  Seller Parties acknowledge that Buyer may desire to effect a tax-deferred like-kind exchange with respect to its purchase of the Real Property pursuant to Section 1031 of Code and any similar provisions of state or local Law (an "**Exchange**").  Seller Parties shall reasonably cooperate with Buyer in effecting any Exchange; *provided*, *however*, in no event shall Seller Parties be required to incur any delays, expenses or risk of ownership, title or conveyance in connection with such cooperation.  Any Exchange will be structured by Buyer at its sole cost and expense.  Seller Parties shall have the right to review and approve any documents to be executed by Seller Parties in connection with any Exchange; *provided*, *however*, such approval shall not be unreasonably withheld, conditioned or delayed.

5.13    <u>Taxes</u>. The Seller Parties shall promptly provide evidence of all Tax payments made for all pre-Closing periods.

SECTION 6<br>EMPLOYEE COVENANTS

6.1.    <u>Employees</u>.  On the Closing Date, the Company shall terminate all employees of the Business.  Buyer may, but will not be obligated to, offer employment to any of the Company employees employed in the Business.  The Company will retain all obligations and liabilities in respect of their current and former employees under the Employee Plans and applicable Laws. Buyer will not assume or otherwise be responsible for any obligation or liability whatsoever arising under or relating to any Employee Plan, or from employment with or termination of employment by the Company, or from the amendment or termination of any Employee Plan.

6.2.    <u>COBRA Liabilities</u>.  The Company will be responsible for providing continuation coverage (within the meaning of Section 4980B of the Code and Part G of Subtitle B of Title I of

886705v17

ERISA) with respect to (a) any former employee of the Company and any other qualified beneficiary who as of the Closing is receiving or is eligible to receive such continuation coverage and (b) any employee of the Company and any qualified beneficiary with respect to such employee, and Buyer will incur no premium or other expense for such coverage.

SECTION 7
CONDITIONS TO THE TRANSFER

7.1.    <u>Conditions to the Obligations of Seller Parties</u>.  The obligation of Seller Parties to consummate the Transfer of the Assets is subject to the satisfaction (or written waiver by Seller Parties) of each of the following conditions:

(a)    at the Closing, Buyer will deliver to the Company, the following documents, duly executed as required:

(i)    an agreement assuming the Assumed Liabilities and Assumed Contracts;

(ii)    the Non-Competition Agreement;

(iii)    a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of managers of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby; and

(iv)    a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

7.2.    <u>Conditions to the Obligations of Buyer</u>.  The obligation of Buyer to consummate the Transfer of the Assets and the assumption of the Assumed Contracts and the Assumed Liabilities is subject to the satisfaction (or written waiver by Buyer) of each of the following further conditions:

(a)    all approvals, consents and waivers set forth in <u>Schedule 3.4(d)</u> shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing;

(b)    Buyer shall have received all Existing Permits;

(c)    Buyer shall have received from Seller Parties either the Title Policy issued by the Title Company or a binding undertaking from the Title Company to issue such Title Policy in accordance with the terms of <u>Section 5.6(d)</u>; and

886705v17

(d)     at the Closing, Seller Parties will deliver to Buyer the following documents, duly executed as required:

(i)     a bill of sale conveying to Buyer the Assets;

(ii)     an assignment to Buyer of Seller Parties' right, title and interest in the Assumed Contracts;

(iii)     special warranty deeds (or their equivalent) conveying to Buyer title to the Real Property, subject only to the Permitted Liens;

(iv)     motor vehicle/transfer/tax forms, if any, transferring the Motor Vehicles to Buyer and either (A) a duly endorsed certificate of title for each Motor Vehicle evidencing that title to such Motor Vehicle is held in a Seller Party or (B) for any leased Motor Vehicle or where an endorsed certificate of title cannot otherwise be provided, a power of attorney appointing Buyer (or its Affiliates) as agent with respect to such Motor Vehicle;

(v)     the Non-Competition Agreement;

(vi)     the Sale Order;

(vii)     a certificate of good standing and existence (or its equivalent) from each of Laurenbrook, Poole FH and PFH Holdings issued by the Secretary of State of the State of Georgia, dated as of the Closing Date or a reasonably current date;

(viii)     a certificate of the Secretary or an Assistant Secretary (or equivalent officer) from each of Laurenbrook, Poole FH and PFH Holdings certifying that attached thereto are true and complete copies of all resolutions adopted by the shareholders and board of directors of such entity authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(ix)     a certificate of the Secretary or an Assistant Secretary (or equivalent officer) from each of Laurenbrook, Poole FH and PFH Holdings certifying the names and signatures of the Person(s) authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder;

(x)     a non-foreign affidavit satisfying the requirements of Section 1445 of the Code from PFH Holdings;

(xi)     an Internal Revenue Service Form W-9 from each of the Seller Parties; and

886705v17

(xii)    all other bills of sale, deeds, transfers, assignments, acts, things and assurances as may be required in the reasonable opinion of Buyer for more perfectly and absolutely Transferring and vesting in Buyer title to the Assets free and clear of all Liens, except Permitted Liens.

SECTION 8
TAX MATTERS

8.1.    Transfer Taxes.  Transfer Taxes, including any deed taxes, that may be imposed by any Governmental Authority, and all recording or filing fees to record the deed and real estate transfer tax form, or to remove an encumbrances, or any notarial fees or other similar costs of Closing with respect to the purchase and sale of the Assets and Business or otherwise on account of this Agreement or the transactions contemplated hereby, will be borne by the Company and/or the Seller Parties; *provided*, *however*, that Buyer shall be responsible for paying any Taxes or fees in connection with transferring the Motor Vehicles to Buyer.  The Seller Parties shall indemnify Buyer against any liability, direct or indirect, for any Taxes (other than ad valorem taxes which shall be prorated pursuant to Section 2.5) imposed on Buyer or on or with respect to the Assets or the operations of the Business that is attributable to any taxable period which ends prior to the Closing Date or with respect to the allocable portion of any taxable period that includes but does not end on the day prior to the Closing Date. The Seller Parties shall be solely responsible for payment to any Governmental Authority of all penalties, interests, and costs arising from any late or improper filings or payments related to pre-Closing Taxes.

8.2.    Certain Tax Matters.  The Company will cause to be included in its (or its parent corporation's) income Tax Returns for all periods or portions thereof ending before the Closing Date, all revenue and expense relating to the operations of the Business during such periods or portions thereof.  Seller Parties will prepare and timely file or cause to be prepared and timely filed all such Tax Returns with the appropriate Governmental Authorities.  Seller Parties will make all payments of Tax shown to be due and owing in such Tax Returns.  Buyer and the Seller Parties will (a) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, audit or other examination by any Governmental Authority or judicial or administrative proceedings relating to the liability for Taxes, (b) each retain and provide the other with any records or other information that may be relevant to such Tax Return, audit or examination, proceeding or determination, and (c) each provide the other with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period.  In addition, the Company will retain until the applicable statutes of limitations (including any extensions) have expired copies of all Tax Returns, supporting work schedules, and other records or information that may be relevant to such Tax Returns for all tax periods or portions thereof ending on or before or which include the Closing Date and will not destroy or otherwise dispose of any such records without first providing Buyer with a reasonable opportunity to review and copy the same.

886705v17

SECTION 9
INDEMNIFICATION

9.1.    Survival.  Notwithstanding any investigations or inquiries made by or on behalf of Buyer or any waiver of conditions by Buyer, the representations and warranties of the parties contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing until 18 months after the Closing Date; *provided*, *however*, that (a) the representations and warranties made in Section 3.7 (Environmental Issues) and Section 3.13 (Taxes) shall survive until the expiration of the applicable statute or period of limitations; and (b) the representations and warranties made in (i) Section 3.1 (Recitals), Section 3.2 (Organization; Power and Authority), Section 3.3 (Validity of Agreement), Section 3.4(a) and 3.4(b) (No Breach; Consents), Section 3.5(b) (Title of Assets) and Section 3.19 (Brokers) (Sections 3.1, 3.2, 3.3, 3.4(a), 3.4(b), 3.5(b), 3.7, 3.13 and 3.19 being collectively referred to as the "**Fundamental Representations**"), (ii) Section 4.1 (Organization; Power and Authority), Section 4.2 (Validity of Agreement) and Section 4.3 (Brokers) shall survive the Closing indefinitely and (iii) the AC Indemnity shall survive the Closing until 60 months after the Closing Date.  The covenants and agreements of the parties contained in this Agreement or in any agreement, certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing indefinitely or for the shorter period explicitly specified therein. Notwithstanding the preceding sentences, any breach of representation or warranty or any covenant or agreement in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentences, if the indemnified party shall have given to the indemnifying party notice of the inaccuracy or breach or other matter giving rise to such right of indemnity prior to such time.

9.2.    Indemnification by Buyer.  From and after the Closing, Buyer will indemnify, defend and hold harmless the Seller Parties, their Affiliates and their respective officers, directors, managers, employees, agents and advisors (the "**Seller Indemnitees**"), from and against any and all Losses suffered or incurred by any Seller Indemnitee resulting or arising from (a) any inaccuracy in or breach of any representation or warranty of Buyer, (b) any failure of Buyer to perform any covenant or agreement contained in this Agreement or the Transaction Documents, (c) any Third Party Claim based upon, resulting from, arising out of, or relating to the Assumed Liabilities, or (d) the Assumed Liabilities.

9.3.    Indemnification by Seller Parties.  From and after the Closing, Seller Parties will, jointly and severally, indemnify, defend and hold harmless Buyer, its parents and Affiliates and their respective officers, directors, managers, employees, agents and advisors (the "**Buyer Indemnitees**"), from and against any and all Losses suffered or incurred by any Buyer Indemnitee, whether or not involving a Third Party Claim, directly or indirectly, caused by, resulting from or arising out of or relating to (a) any inaccuracy in or breach of the Fundamental Representations, (b) any inaccuracy in or breach by any of Seller Parties of any representation or warranty of any of Seller Parties contained in this Agreement or in the documents delivered pursuant to the provisions of this Agreement, other than the Fundamental Representations, (c) the failure of any of Seller Parties to perform any covenant, obligation or agreement of any of Seller Parties contained in this Agreement or in the documents delivered pursuant to the provisions of this Agreement, (d) the Retained Liabilities, (e) any Third Party Claim based upon, resulting from, arising out of, or relating to the Retained Liabilities, (f) any claim, demand, action, proceeding or

886705v17

lawsuit made or filed by any trustee or receiver or other interested party in connection with or as a result of or otherwise following the insolvency, reorganization or bankruptcy of any Seller Party, whether made or filed as part of formal bankruptcy or reorganization proceedings or otherwise, which claim, demand, action, proceeding or lawsuit in any way challenges, seeks to set aside or deprive Buyer of the benefits of the transaction contemplated by this Agreement or (g) any difference between the death benefit actually paid to Buyer or any of its affiliates and the original policy amount with respect to insurance policies issued by Atlantic Coast Life Insurance Company or any of its affiliated entities (the "**AC Indemnity**"). The parties agree that if a Buyer Indemnitee recovers any amount pursuant to the AC Indemnity with respect to any insurance policy and thereafter receives insurance proceeds from Atlantic Coast Life Insurance Company or any of its affiliated entities or successors with respect to the same insurance policy, Buyer shall promptly pay the Designated Recipient an amount equal to the insurance proceeds thereafter actually received, not to exceed the amount previously recovered pursuant to the AC Indemnity with respect to such insurance policy.

9.4.    Certain Limitations.

(a)    After the Closing, Seller Parties shall not be required to indemnify the Buyer Indemnitees for Losses under Section 9.3(b) until the aggregate amount of all such Losses exceeds 0.5% of the Purchase Price (the "**Basket**"), in which event Seller Parties shall only be responsible for the amount of such Losses in excess of the Basket; *provided*, *however*, that the foregoing limitation shall not apply in respect of any Losses relating to any willful breach of representation or warranty.

(b)    With respect to Seller Parties' obligations under Section 9.3(b), the aggregate maximum liability of Seller Parties shall be equal to 15% of the Purchase Price; *provided*, *however*, that the foregoing limitation shall not apply in respect of any Losses relating to any willful breach of representation or warranty.

(c)    With respect to Seller Parties' obligations under Section 9.3(a) and Section 9.3(b), the aggregate maximum liability of the Seller Parties shall not exceed the sum of the Purchase Price.

(d)    With respect to Seller Parties obligation under Section 9.3(g), (i) the aggregate maximum liability of the Seller Parties shall not exceed the Holdback Amount, (ii) Buyer's remedy with respect to the AC Indemnity shall be solely limited to the Holdback Amount and (iii) Buyer shall have no additional rights of recovery against any Seller Party with respect to the AC Indemnity.

(e)    For purposes of this Section 9, the amount of Losses with respect to any breach of a representation or warranty shall be determined without regard to any limitation or qualification as to materiality, Material Adverse Effect or similar qualification contained in or otherwise applicable to such representation or warranty.

9.5.    Notice of Claim; Right to Participate and Defend Third Party Claim.

(a)    If any indemnified party receives notice of the assertion of any claim, the commencement of any suit, action or proceeding, or the imposition of any penalty or

assessment by a third party in respect of which indemnity may be sought hereunder (a "**Third Party Claim**"), and the indemnified party intends to seek indemnity hereunder, then the indemnified party will promptly provide the indemnifying party with prompt written notice of the Third Party Claim, but in any event not later than thirty days after receipt of such notice of Third Party Claim.  The failure by an indemnified party to notify an indemnifying party of a Third Party Claim will not relieve the indemnifying party of any indemnification responsibility under this Section 9, except to the extent, if any, that such failure materially prejudices the ability of the indemnifying party to defend such Third Party Claim.

(b)      The indemnifying party will have the right to control the defense, compromise or settlement of the Third Party Claim with its own counsel (reasonably satisfactory to the indemnified party) if the indemnifying party delivers written notice to the indemnified party within seven days following the indemnifying party's receipt of notice of the Third Party Claim from the indemnified party acknowledging its obligations to indemnify the indemnified party with respect to such Third Party Claim in accordance with this Section 9; *provided*, *however*, that if the indemnifying party is any Seller Party, such indemnifying party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by or on behalf of a Person that is a supplier or customer of the Business, or (y) seeks an injunction or other equitable relief against the indemnified party.  The indemnifying party will not enter into any settlement of any Third Party Claim which would impose or create any obligation or any financial or other liability on the part of the indemnified party if such liability or obligation (i) requires more than the payment of a liquidated sum, or (ii) is not covered by the indemnification provided to the indemnified party hereunder.  In its defense, compromise or settlement of any Third Party Claim, the indemnifying party will timely provide the indemnified party with such information with respect to such defense, compromise or settlement as the indemnified party may request, and will not assume any position or take any action that would impose an obligation of any kind on, or restrict the actions of, the indemnified party.   The indemnified party will be entitled (at the indemnified party's expense) to participate in the defense by the indemnifying party of any Third Party Claim with its own counsel; *provided*, *however*, that if in the reasonable opinion of counsel to the indemnified party, (A) there are legal defenses available to an indemnified party that are different from or additional to those available to the indemnifying party; or (B) there exists a conflict of interest between the indemnifying party and the indemnified party that cannot be waived, then the indemnifying party shall be liable for the reasonable fees and expenses of counsel for the indemnified party in each jurisdiction for which the indemnified party reasonably determines counsel is required.

(c)      If the indemnifying party does not undertake the defense, compromise or settlement of a Third Party Claim in accordance with Section 9.5(b), the indemnified party will have the right to control the defense or settlement of such Third Party Claim with counsel of its choosing; *provided*, *however*, that the indemnified party will not settle or compromise any Third Party Claim without the indemnifying party's prior written consent unless the terms of such settlement or compromise release the indemnified party and the indemnifying party from any and all liability with respect to the Third Party Claim.

886705v17

(d)      Any indemnifiable claim hereunder that is not a Third Party Claim will be asserted by the indemnified party by promptly delivering notice thereof to the indemnifying party.  If the indemnifying party does not respond to such notice within sixty days after its receipt, it will have no further right to contest the validity of such claim.

9.6.    Effect of Investigation.   The representations, warranties and covenants of the indemnifying party, and the indemnified party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the indemnified party (including by any of its directors, managers, officers, employees, consultants, financial advisors, counsel, accountants or other agents) or by reason of the fact that the indemnified party or any of its directors, managers, officers, employees, consultants, financial advisors, counsel, accountants or other agents knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the indemnified party's waiver of any condition set forth in Sections 7.1 or 7.2, as the case may be.

9.7.    Exclusive Remedy. Except for (a) any claims based upon fraud, willful misconduct, criminal conduct or intentional misrepresentation on the part of a party to this Agreement in connection with the transactions contemplated by this Agreement and (b) the determination of the Purchase Price in accordance with Section 2.4 (Purchase Price), the indemnification provisions in this Section 9 will be the sole and exclusive remedy and recourse for any breach of any representation and warranty in this Agreement by Buyer or the Seller Parties. Nothing in this Section 9.7 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled.

9.8.    Wavier of Certain Damages.  Notwithstanding anything in this Agreement to the contrary, no indemnifying party shall have any liability to any indemnified party for any indirect, consequential, exemplary, special or punitive Losses, including, without limitation, loss of profits, loss of business opportunity, loss of use or loss of goodwill, even if such Losses were foreseeable or the indemnifying party was advised of the possibility of such Losses, *provided, however*, that this Section 9.8 shall not limit a party's right to recover Losses under this Section 9 for such Losses to the extent such party is required to pay such Losses in connection with a Third Party Claim and such Losses are actually paid by such party.

SECTION 10
MISCELLANEOUS

10.1.   Entire Agreement.  This Agreement, including the Exhibits and Schedules to this Agreement, and the Transaction Documents constitute the entire agreement of the parties to this Agreement with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof and thereof.

10.2.   Notices.  All notices, requests and other communications to any party hereunder shall be in writing and shall be deemed to be given:

(a)      When delivered in person or by email transmission (with acknowledgment received) to the individual or officer of the company, to which notice is directed;

886705v17

(b)       Three days after the same has been deposited in the United States Mail, sent Certified or Registered mail with Return Receipt Requested, postage prepaid and addressed as provided in this Section 10.2; or

(c)       When delivered by generally recognized overnight delivery service (including United States Express Mail, FedEx and UPS), with proof of delivery and with all charges prepaid by the sender addressed as provided in this Section 10.2.  Notices shall be sent as follows:

if to Buyer, to:

> SCI Georgia Funeral Services, LLC
> 1929 Allen Parkway
> Houston, Texas 77019
> Attention:  Katie Walker, Vice President
> Email:  Katie.Walker@sci-us.com

with a copy to:

> SCI Shared Resources, LLC
> c/o Service Corporation International
> 1929 Allen Parkway
> Houston, Texas 77019
> Attention:  General Counsel

if to Seller Parties, to:

> Morgan, Lewis & Bockius LLP
> 1000 Louisiana, Suite 4000
> Houston, Texas 77002
> Attention: Jeff S. Dinerstein
> Email: jeff.dinerstein@morganlewis.com

and

> RMR Legal PLLC
> 70 N. Ocoee Street
> Cleveland, TN 37311
> Attn: Roy Roman
> E-mail: roymichael@rmrlegal.com

or such other address as such party may hereafter specify for such purpose by notice to the other parties to this Agreement, (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).

10.3.    Amendments; No Waivers.

886705v17

(a)      Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each Seller Party and Buyer, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)      No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

10.4.   Exhibits and Schedules. All Exhibits and Schedules attached to this Agreement are hereby incorporated by reference and made a part hereof.

10.5.   Expenses.  Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the transactions contemplated herein shall be paid by the party incurring such cost or expense, except for any filing fees, which filing fees shall be borne solely by Seller Parties.

10.6.   Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns, *provided* that, no party to this Agreement may assign, delegate or otherwise transfer any of such party's rights or obligations under this Agreement without the prior written consent of the other parties to this Agreement, except that Buyer may freely assign this Agreement or otherwise transfer its rights or obligations hereunder to an Affiliate of Buyer or to the purchaser of Buyer or the Business (whether indirectly, by merger, operation of law or otherwise). Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended or will be construed to confer on any Person other than the parties to this Agreement or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement or any transaction contemplated hereby.

10.7.   Certain Interpretive Matters.

(a)      Unless the context otherwise requires, (i) all references in this Agreement to Sections or Schedules are to Sections or Schedules of or to this Agreement, (ii) each term defined in this Agreement has the meaning ascribed to it, (iii) words in the singular include the plural and *vice versa;* and (iv) the words "including," "includes" and "include" mean including (or includes or include) without limitation.  All references to "$" or dollar amounts will be to lawful currency of the United States of America.  Except as the context otherwise requires, all references to a "party" refer to either Buyer or the applicable Seller Party, and all references to the "parties" refers to Buyer and Seller Parties collectively.

(b)      Titles and headings to Sections in this Agreement are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  No provision of this Agreement will be interpreted in favor of, or against, any of the parties to this Agreement by reason of the extent to which

886705v17

any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

10.8.   Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.

(a)      Except to the extent that the Laws of the State of Georgia are mandatorily applicable in connection with the conveyance of real property located in the State of Georgia or in connection with the execution and administration of Preneed Agreements and related regulatory matters, which matters shall be governed, construed and enforced in accordance with Laws of the State of Georgia, this Agreement shall be construed in accordance with and governed by the internal substantive laws of the State of Texas regardless of the Laws that might otherwise govern under principles of conflict of laws applicable thereto.

(b)      ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF TEXAS SITTING IN HARRIS COUNTY, TEXAS OR THE COURTS OF THE STATE OF TEXAS LOCATED IN THE COUNTY OF HARRIS, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)      EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, AS APPLICABLE, BY, AMONG

886705v17

OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.8.

10.9. <u>Counterparts; Effectiveness</u>. This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and to this Agreement were upon the same instrument. This Agreement shall become effective when each party to this Agreement shall have received counterparts hereof signed by the other parties to this Agreement. A facsimile or electronically transmitted signature shall constitute an original.

10.10. <u>Remedies Not Exclusive</u>. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each remedy will be cumulative and will be in addition to every other remedy given hereunder or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies will not constitute a waiver of the right to pursue other available remedies.

10.11. <u>Confidentiality</u>. Seller Parties shall maintain in strictest confidence all information related to the Business unless compelled by applicable Law or Governmental Authority to disclose such information. This <u>Section 10.11</u> shall not apply to any information that is, or could reasonably be, learned or discovered through any independent source that is not obligated to maintain such information as confidential.

10.12. <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is determined by a Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect and will in no way be affected, impaired or invalidated.

10.13. <u>Third Party Beneficiaries</u>. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer or shall be construed to confer on any Person other than the parties to this Agreement or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in <u>Section 9.2</u> with respect to Seller Indemnitees and <u>Section 9.3</u> with respect to Buyer Indemnitees.

10.14. <u>Release</u>. Effective as of the Closing, Seller Parties hereby irrevocably release, acquit and forever discharge and waive any Loss, rights, promises, covenants, contracts, suits, proceedings, actions or causes of actions, of any kind, known or unknown, matured or unmatured, absolute or contingent, at law or in equity, which Seller Parties have against or regarding the Assets or the Business.

10.15. <u>Joint and Several Obligations</u>. Seller Parties shall be jointly and severally liable for each obligation of each Seller Party under this Agreement.

***[The remainder of this page is intentionally left blank. Signature pages follow.]***

886705v17

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year first above written.

**LAURENBROOK:**

LAURENBROOK MANAGEMENT, INC.

By:_____
Name: Brian Poole
Title: President

**POOL FH**:

POOLE FUNERAL HOME ENTERPRISES, INC.

By:_____
Name: Brian Poole
Title: President

**PFH HOLDINGS**:

PFH HOLDINGS, INC.

By:_____
Name: Brian Poole
Title: President

**PRINCIPAL**:

_____
BRIAN POOLE

886705v17

**BUYER**:

SCI GEORGIA FUNERAL SERVICES, LLC


By:_____
Name: Daniel I. Kleban
Title: Vice President

886705v17

### EXHIBIT A

### PURCHASE PRICE ALLOCATION

| | Poole FH | Thomas L. Scroggs Funeral Directors | Total |
|---|---|---|---|
| **CLASS I** | | | |
| Cash | | | - |
| **CLASS II** | | | |
| Marketable Securities | | | - |
| **CLASS III** | | | |
| Accounts Receivable | | | - |
| **CLASS IV** | | | |
| Inventory | | - | - |
| **CLASS V** | | | |
| Equipment | 50,000 | 25,000 | 75,000 |
| Land | 780,000 | 666,900 | 1,446,900 |
| Building & Land Improvements | 1,820,000 | 1,556,100 | 3,376,100 |
| Vehicles | 85,000 | 61,000 | 146,000 |
| **CLASS VI** | | | |
| Intangibles (other than goodwill) | | | - |
| **CLASS VII** §197 | | | |
| Goodwill | 317,500 | 188,500 | 506,000 |
| **Purchase Price** | **$3,052,500** | **$2,497,500** | **$5,550,000** |

886705v17